UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| NATHANIEL JOSEPH AND KECIA JOSEPH, LUCINDA MITCHELL | * | CIVIL ACTION NO. |
| | * | |
| VS | | SECTION |
| BACH & WASSERMAN, LLC, GERALD WASSERMAN, ABC INSURANCE COMPANY | | MAG: |
| _____ | * | |

**COMPLAINT FOR VIOLATIONS
OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT,
FRAUD, THEFT, AND VIOLATIONS OF LOUISIANA STATE LAW**

NOW INTO COURT, through undersigned counsel, comes NATHANIEL

JOSEPH and KECIA JOSEPH, both persons of the full age of majority and domiciled

within the jurisdictional territory of this Court who, with respect, represents:

**<u>JURISDICTION</u>**

1.     Petitioners bring this action against Defendants for their violations of the

**Racketeer Influenced and Corrupt Organizations Act**, 18 U.S.C. §1961, *et*

*seq* and for other causes of action as set forth herein.

a.     This Honorable Court has jurisdiction over this civil action pursuant to

18 U.S.C. §§1962(a), (b), ( c ) and (d), 1964( c ), and 28 U.S.C. §§1331 and

1337.  This is a civil action arising under 18 U.S.C. §§1961-1968, §901(a) of Title

IX of the Organized Crime Control Act of 1970, as amended, otherwise known as

the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and in

particular, under 18 U.S.C. §1964 and other causes of action as set forth

hereafter.

2.      This court also has jurisdiction of state claims brought under:

    a.      La. Civil Code Article 2315, et seq., and 2324, for fraud, theft,

        misrepresentation, other violations and violations of Louisiana General

        Tort Law.

    b.      the La. Unfair Trade Practices and Consumer Protection Act, La. R.S.

        51:1401 et seq.

    c.      Louisiana Racketeering Act.  La. R.S. 15:1351

### **VENUE OF RICO CLAIM**

3.      Venue of the RICO claim lies within this district:

    a.      Venue lies with this district pursuant to 18 U.S.C. §1965 and 28 U.S.C.

§1391.  Defendants at relevant times conducted business in this district; the

violations occurred in this district; defendants transact or have transacted their

affairs in this district, and their conduct, upon which this action is founded, was

directed at and intended to injure Petitioners in this district.

    b.      Defendants, either on their own or through their agents, at the time of the

commission of the acts alleged hereunder, were found in, and/or transacted

business in the State of Louisiana, and the cause of action which is the object of

this Complaint arises out of business transactions in the State of Louisiana,

including specific acts within this district.

    c.      Defendants, either on their own or through their agents, conspired to

commit within the State of Louisiana the wrongful acts alleged in this Complaint

and/or committed or participated in the commission of those acts within or

without the State of Louisiana, purposefully directing their wrongful acts toward

the forum of Louisiana, causing, in Louisiana, directly or indirectly, the violations of RICO and the other causes of action set forth herein and Petitioners' resultant injuries.

d.      Defendants' racketeering activities were conducted through a pattern of acts and transactions which occurred and/or had their effect within the State of Louisiana, in this district.

e.      In connection with the acts and conduct described herein, the Defendants directly or indirectly used the means of interstate commerce, including the mails and telephones.

## NON-RICO CAUSES OF ACTION

4.      This Court has jurisdiction over the following Non-RICO claims:

a.      Under State Law - **General tort law and La. Civil Code 2315**, et seq - intentional infliction of emotional distress;

b.      Under the Louisiana Racketeering Act (La. R. S. 15:1351, et seq.),

c.      Under the Louisiana Unfair Trade Practices and Consumer Protection Act (LUTPA) (La. R. S. 51:1405 et seq.),

5.      This Court has pendent jurisdiction of Claimant's claims under the Louisiana Civil Code Article 2315, 2324 and General Louisiana Tort Law for intentional infliction of emotional distress.

## VENUE OF NON-RICO CLAIMS

6.      Claimants and defendants reside in this District and  this action arose in this District.

## PARTIES

**Petitioners:**

7.     Nathaniel Joseph and Kecia Joseph are persons of the full age of majority and domiciled within the jurisdictional territory of this Court.

8.     Lucinda Mitchell is a person of the full age of majority and domiciled within the jurisdictional territory of this Court.

**Defendants**:

9.     GERALD D. WASSERMAN, a person of the full age fo majority, resident of and domiciled in the Parish of Orleans, State of Louisiana, at 950 Turquoise Street, New Orleans, LA 70114

10.    Bach and Wasserman, LLC, is an LLC authorized to do and doing business within the jurisdictional territory of this Court.

## FACTS

11.    On or about May, 2002 Your Petitioners received a settlement from a personal injury matter.    Thereafter your Petitioners made some investments, including but not limited to investments in several retail food trailers:

a.     In or about May of 2002, Petitioners purchased two (2) new food units for their business from Custom Sales.  Petitioners paid for the smaller unit in full and left a deposit on the larger unit.

b.     One half the price on the larger unit was required as a deposit before Customs would begin building, or $135,000.00, which was non-refundable.

c.     After receiving the smaller unit, Petitioner's parents continued to operate Mitchell's at their first location, while Petitioners Mr. and Mrs. Joseph began improvements on the rear acre of their Jean Lafitte Property, and their 26 unit apartment complex in August 2002.

d.   Due to unforeseen complications beyond Petitioner's control, the larger unit was delayed, problems developed in the improvements on the Jean Lafitte property and apartment complex.

e.   Petitioners advised Customs that, due to the unforeseen events and delay in building the second unit, petitioners' finances were dwindling and they needed more time to raise the balance on the large unit which grew to $175,000.00.  Customs did not do financing and further reminded Petitioners that the deposit was non-refundable and they would lose the unit and their deposit if the balance was not paid in time, upon delivery.

f.   In January of 2003, petitioners contacted Pontchartrain Mortgage (Mr. Pace) seeking financial assistance.  Pontchartrain acknowledged that Petitioners had enough collateral, but not enough points to qualify for a personal or business loan.   Pontchartrain then introduced Petitioners to defendant Wasserman whom Mr. Pace presented as a "specialist in this kind of problem."

12.   After experiencing financial difficulty, Petitioners were introduced to the Defendant, GERALD D. WASSERMAN, for the purpose of making a small loan and/or alternatively to purchasing an existing loan Your Petitioners had with a local institution.

a.   When Petitioners first met defendant Wasserman, he presented himself as a kind individual willing to help Petitioners save their money and their large unit petitioners stood to lose if the balance was not paid in time.

b.   After informing Customs (Linda) that they had someone willing to loan them

the remaining balance, and after Customs (Linda) spoke to defendant Wasserman, the unit arrived in a few days.

c.    Customs (Linda) informed Petitioners and defendant Wasserman that she had only two days to complete the closing or return the unit if the balance was not paid.

d.    Prior to the arrival of the unit, defendant Wasserman first agreed to do a bond for deed re the larger unit and the loan, and agreed to lend the money himself.  After the unit arrived, defendant Wasserman suddenly and without warning changed  track in mid-stream and came up with the idea of Petitioners purchasing the Lafitte Property, qualifying himself for the loan by selling Petitioners the points they needed, drawing up a lease with an option to buy back in two years with an interest rate of 12% charged to Petitioners for the loan defendant Wasserman made to them for the Lafitte Property.

e.    Petitioner Nathaniel Joseph asked defendant Wasserman why he was suddenly changing the agreement at the 11th hour, when the unit was due to arrive.  Defendant Wasserman told Petitioners to "take it or leave it", knowing that Petitioners had no choice but to take his deal and be sucked into his fraudulent scheme.

f.    On the day the unit arrived, defendant Wasserman and Linda of Customs had a private conversation, and then defendant Wasserman presented yet another wrinkle of his fraudulent scheme by having petitioner's parents pledge their business and both trailers as collateral in the initial agreement between defendant Wasserman and the Josephs.  Defendant Wasserman

told the Mitchells that they "could take it or leave it" as well.

g.    Defendant Wasserman, due to his position as Petitioner's lawyer and lender, knew that Petitioner's were in a bind, steered Petitioners further into that bind, and then took advantage of them through the fraudulent schemes subject of this suit.

13.    Between the period of February, 2003 and January, 2004, the Defendant, GERALD D. WASSERMAN, became intimately involved in Petitioners' business, including but not limited to:

A.    purchasing Petitioners' fully paid home and leasing said home back to Petitioners,

B.    arranging for other investors to obtain mortgages on Petitioners' property,

C.    placing collateral mortgages on virtually all of Petitioners ' property and

D.    handling all HUD

(1)    statements,

(2)    acts of sale,

(3)    mortgage preparation,

such that by the end of January, 2004, the Defendant, GERALD D. WASSERMAN, had literally acquired an interest in all of Petitioners' assets and property through fraudulent misrepresentation to Petitioners regarding what was necessary and proper in the conduct of their affairs.

E.     Wasserman set aside any money left over from the HUD Statements (2), and claimed that he was putting the money in escrow for future security in case Petitioners missed any payments or were late on any payments on the

fraudulent debts Petitioners now had in favor of Wasserman.   Wasserman also used this illegally held money for family vacations.

F.      Defendant Wasserman collected over $12,000.00 to "insure" the Lafitte property and the lease agreement between Wasserman and his clients, the Josephs, and for "advanced rents" on the Lafitte property.

G.      Wasserman set the payments at $3,000.00 per month to be paid by Petitioners beginning in April 2003.

H.      After the Joseph's financial situation worsened (as expected, given Wasserman's schemes and manipulations) the Petitioners were forced to leave the Lafitte property and were sued by Jerome Myles and Reginald Curley along with the Wassermans and Atlantic Casualty in May 2005.

I.      In February of 2011, after finding documents for current counsel, petitioner Nathaniel Joseph telephoned American Claims, who attached a letter to the lawsuit.   Petitioner spoke to Tom Aichele, and agent for American Claims who, by fax and telephone, updated Petitioner on the status of the 2005 lawsuit.  Aichele informed Petitioner that American Claims was dismissed from the lawsuit along with their clients, the Wassermans, and that petitioners were never added as insureds on the property in Jean Lafitte.

J.      Under the lease agreement with option to purchase the Jean Lafitte property, authored by Wasserman, it is stipulated that petitioners were to pay for additional insurance on the Lafitte Property, with was to insure any losses by both lessor and lessee.

K.      The letter from Tom Aichele dated 02/15/2011, shows that Wasserman never

intended to resell petitioners their home and never intended to honor the contract and agreement dated 02/27/2003, and that petitioners were never the clients of Aichele as represented to them by Wasserman.

L.   According to the letter from Aichele dated 02/15/2011, Wasserman submitted a version of a lease that said Wasserman was the only one to be insured on the lease, which is how the Wassermans got dismissed from the 2005 lawsuit.

M.   Upon information and belief, Wasserman submitted a false and fraudulent lease to the insurance company.

13a.   Defendant Wasserman, through fraudulent misrepresentation, lies, deceit and illegal practices in the practice of law and as Petitioner's representative and lender, collateralized all of petitioners' properties and businesses, placed liens on all of petitioners' properties and businesses, drew up fraudulent contracts and other legal documents in his office, mailed said documents and contracts to petitioners and state and federal agencies, and constantly threatened Petitioners with seizure of all of their property and businesses if they should miss any payments to defendant Wasserman for loans they did not owe.

13b.   *In executing the fraudulent acts described herein, Wasserman sent or caused to be sent the following documents to be sent through the U. S. Mails, each being part of his intentional and fraudulent scheme against Plaintiffs, each amounting to an individual count of mail fraud:*

**_1637 Jean Lafitte Property_**:

(1)    Defendant Wasserman, as part of his fraudulent schemes, concocted the contract between himself and petitioners for the cash sale of the Jean Lafitte Property, signed on the 27th day of February, 2003, and mailed by defendant to petitioners.

(2)    Defendant drew up the HUD Statement Number 1 for the Jean Lafitte Property, signed on the 27th day of February, 2003, and mailed by defendant to petitioners.

(3)    Defendant authored HUD Statement Number 2 for the Jean Lafitte Property (unsigned) and mailed it to Mr. Robert Harvey in or about March 2004.

(4)    Defendant authored the two year lease with option to buy back the Jean Lafitte Property between himself (Wasserman) and petitioners, signed on the 27th of February, 2003, and mailed by defendant to petitioners.

(5)    Defendant authored the Act of Pledge and Agreement Number (1) between defendant (Wasserman), Mitchell's Fruit Stand Inc., Lucinda Mitchell & Frank Mitchell, and the Petitioners (Josephs), signed on the 27th day of February, 2003, and mailed or caused it to be mailed to petitioners.

(6)    Defendant authored and mailed or caused to be mailed a letter to

American Claims allegedly insuring the property at 1637 Jean Lafitte as part of his fraudulent schemes.  Defendant deducted the premiums from funds he illegally held for Petitioners, without petitioners' knowledge, and defendant further incorporated the insurance payments into the lease agreement w/option to buy back, and mailed it to the agency for Atlantic Casualty on behalf of Wasserman and, allegedly, the Josephs.

(7)     Defendant authored and mailed or caused to be mailed all contracts involving loans, sales, insurance, taxes, deductions from both HUD Statements re the Jean Lafitte Property to all respective state and federal agencies, to Pontchartrain Mortgage, Chase Mortgage, and all other entities on behalf of the Wassermans, the Josephs, Mitchell's Incorporated, Lucinda & Frank Mitchell on or after the 27th day of February, 2003.

### 2216 Glasgow Property

(8)     Defendant authored and mailed the Act of Pledge Agreement Number (2) between the Josephs, Mitchells an the Wassermans to secure the property at 2216 Glasgow Drive, a 26 unit apartment complex, on or after May 5, 2003.

(9)     Defendant authored and mailed HUD Statement Number (3) re the property at 2216 Glasgow Drive, the apartment complex.  Signed by

Wasserman and the Josephs, and mailed to the Josephs, to the respective state and federal agencies, the mortgage companies by defendant Wasserman, who also mortgaged the property for $100,000.00 on May 5, 2003.

(10)   Defendant authored and mailed HUD Statement Number (4) re the property at 2216 Glasgow Drive (Apartments), signed by defendant Wasserman, James Ramsey, and the Josephs.   Wasserman mortgaged the property for another $70,000.00 in the name of Dixon's Property, and mailed the documents to the respective state and federal tax offices, along with insurance deducted, and other loan payments paid on behalf of the Josephs on or after July 27, 2003.l

(11)   Defendant authored and mailed the Act of Pledge Agreement between Wasserman, James Ramsey, and the Josephs, signed on July 27, 2003, to the same parties.

### *The 52 and 26 foot mobile restaurant unit and trailer*

(12)   Defendant authored three (3) liens in his (Wasserman's) favor totaling $100,000.00 on the food units owned by petitioners: Josephs, Mitchells and the petitioner's family corporation, Mitchell's Fruit Stand, and mailed the documents on or after February 26-27, 2003.

(13)   Defendant authored and mailed fraudulent letters which included false allegations and claims regarding conversations and meetings with Mr.

Robert Harvey on or about February 12, 2004, in regards to the threats levied by defendant against petitioners if petitioners did not pay to Wasserman the fraudulent loan of $375,000.00.   A loan with 12% interest annually according to fraudulent contracts relating to numbers (1) through (12).

(13b)  Defendant authored and mailed fraudulent documents allegedly signed by Lucinda Mitchell, releasing Wasserman of any liability, between January 2004 and March 2004, to Robert Harvey and petitioners.

(14)   Defendant Wasserman had James Ramsey write a letter to Robert Harvey (then Petitioners' attorney) stating the he, Ramsey, would begin to pay petitioners $700.00 per month on behalf of defendant Wasserman.   No such payments were ever made nor intended to be made.

(15)   Defendant Wasserman mailed to Robert Harvey four (4) HUD Statements, three (3) liens, Bank Checks to Robert Harvey in an attempt to falsely and fraudulently account for some of the money defendant Wasserman stole from petitioners through his fraudulent schemes carried out with the use of the U. S. Mail system. Wasserman admitted to having spent large sums of Petitioners' money on family vacations.

14.   That by January, 2004, the Defendant, GERALD D. WASSERMAN, was alleging

that your Petitioners owed Defendant, GERALD D. WASSERMAN, Three Hundred Seventy Five Thousand ($375,000.00) Dollars.   This assertion and claim by WASSERMAN was knowingly and intentionally false, and designed to fraudulently receive from Petitioners money he was not owed.

15.   As a result, the Defendant required Petitioners make monthly payments to the Defendant and the Defendant was collecting revenue from Petitioners assets, allegedly against the debt of $375,000.00

16.   Petitioners discovered in February, 2004 that they did not owe the Defendant $375,000.00.

17.   That during the month of January through March, 2004, Your Petitioners learned that the Defendant, GERALD D. WASSERMAN, had charged Your Petitioners excessive, exorbitant fees and points on all of the sales and mortgages prepared by the Defendant for Petitioners.   Further, the U. S. Mails were used to perpetuate these fraudulent acts upon Petitioners as described in non-exclusive particulars above.

18.   Defendant, on numerous occasions, threatened Petitioners that failure to sign certain documents prepared by the Defendant, GERALD D. WASSERMAN, would result in all of their property being seized.   These threats of fraudulent seizure were carried out with the use of the U. S. Mails.   Further, these threats amount to extortion for the gain of money not deserved or earned by WASSERMAN. WASSERMAN.

19.   Out of fear of losing everything, your Petitioners complied with the Defendant's requests.   These fraudulent practices were committed upon Petitioners while

defendant WASSERMAN was acting as their legal counsel through the use of the law firm of BACH and WASSERMAN.

20. Petitioners learned in January through March, 2004, that the Defendant, GERALD D. WASSERMAN, without just or legal cause, had acquired a priority interest in all of Your Petitioners' assets and property, including sums of money being paid on a regular basis to Petitioners.

21. These sums were collected by the Defendant as a result of defendant's fraudulent allegation that Petitioners owed the Defendant $375,000.00 and that Petitioners' property was collateral to secure payment of these sums of money.

22. That during the period of time that the Defendant was collecting mortgage payments, notes, and other assets belonging to Your Petitioners, the Defendant, GERALD D. WASSERMAN, also required that Petitioners and their mother pay additional sums fo money in the form of monthly payments on a debt that did not exist.

23. That in February, 2004 and on dates thereafter, Petitioners, through an attorney, requested documentation for all of the money that the Defendant was keeping and requiring that Petitioners pay.

24. At no time did the Defendant, GERALD D. WASSERMAN, make a proper accounting to Petitioners for the mortgages and monies Defendant not only received but kept as a result of the fraudulent transactions.  Defendant WASSERMAN has failed to make said disclosures to this date.  ***As of the filing of this lawsuit, defendant Wasserman  has still not returned all documents or made a full accounting of Petitioners' funds and property.***

Page 15 of  34

25. Further, the Defendant, when asked to make an accounting, did so only partially and piece-meal.

26. That at all times relevant, the Defendant, GERALD D. WASSERMAN, in concert with others, arranged for additional investors in property owned by Petitioners, such that the payments on the investment would go to the Defendant, WASSERMAN, all without legal or just cause, utilizing the same allegation that Petitioners owed WASSERMAN money.

27. That all times relevant and during all of the transactions, GERALD D. WASSERMAN, prepared the HUD statements, alleging that Petitioners had received sums of money which in fact Petitioners did not receive, all in violation of HUD laws.

28. WASSERMAN used the U. S. Mails and electronic interstate communications facilities to aid in the perpetration of all fraudulent acts upon Petitioners.

29. In furtherance of his illegal acts, individually and with others, the Defendant, GERALD D. WASSERMAN, caused Your Petitioners to mortgage their investment apartments and retail food trailer in order to secure a debt that did not exist.

30. That Defendant, in concert with others particularly members of his law firm, did prepare mortgages with HUD statements, intermingling credits belonging to Petitioners by alleging that Nathaniel Joseph's mother be included for payment of sums deducted from the mortgage transactions.

31. That at all times relevant, NATHANIEL JOSEPH's mother, Lucinda Mitchell, was not part of Petitioners" financial transactions.

32. That during the months of February, March and April, 2004, the Defendant, GERALD D. WASSERMAN, told Petitioners' representative that Petitioners owed

Defendant $375,000.00 and that in order to release the previously mentioned food trailers from mortgage, Petitioners would have to come up with $100,000.00 which he later reduced to $25,000.00.

33.   In a state of panic and fear, Your Petitioners borrowed the money to pay GERALD D. WASSERMAN, believing that Petitioners were going to lose an asset valued in excess of $400,OOO.OO, only to learn later that Petitioners owed nothing to GERALD D. WASSERMAN,  and had to borrow money, which eventually resulted in the loss of the trailer because Petitioners have been placed in such a poor financial condition that they have been unable to recover.

34.   That during the time period in which Your Petitioners were doing business with the Defendant, Lucinda Mitchell was required to make payments to the Defendant for a debt she did not owe and without ever receiving an accounting.

35.   Shortly after Petitioners retained the services of an attorney, the Defendant, GERALD D. WASSERMAN, contacted Petitioners and his mother, Ms. Mitchell, and offered Petitioners $5,000.00, allegedly in reparation for some of the past transactions.

36.   However, at the time the Defendant, WASSERMAN, had Petitioners sign a receipt for the $5,000.00, which contained a full release for the Defendant. At no time did the Defendant explain that Petitioners were releasing Defendant from all of the past illegal transactions.

37.   That as a result of the partial accounting furnished to Petitioners during the month of February and March, 2004, Petitioners learned that the Defendant had collected a minimum of $104,654.00 of Petitioners' money to which Defendant was not due.

At no time did Defendant make an accounting for this money.

38.   Further, Defendant, GERALD D. WASSERMAN, has steadfastly refused to produce canceled checks for the exorbitant charges which he made against Petitioners' in their mortgage transactions.

39.   That as of the date of filing of this petition, Petitioners have still not received a full accounting from the Defendant, GERALD D. WASSERMAN.

40.   That on March 30, 2004, Defendant, GERALD D. WASSERMAN, admitted to Petitioners' representatives that Petitioners did not owe Defendant $375,000.00 but that he *thought* they owed him $375,000.00 and that he was "attempting to collateralize for any potential future money owed."

41.   That at no time, during any of the transactions reflected in the attached HUD statements did Petitioners ever receive those amounts of money and that on occasion duplicate HUD statements were prepared for the same transactions with different charges, creating confusion and deception for which Petitioners have never received an explanation.

42.   That the Defendant, GERALD D. WASSERMAN;has engaged in deceptive practices and has consistently misled Petitioners, knowing that Petitioners lacked the skills and education to understand, much less deal with the transactions, resulting in serious and permanent losses to Petitioners.

43.   At no time during the transaction did the Defendant, WASSERMAN, advise Petitioners to seek advice of outside counsel.

44.   That at all times relevant, GERALD D. WASSERMAN, represented both Petitioners, himself and others in transactions with Petitioners, all to Petitioners'

disadvantage and in conflict.

45.     As a result of Defendant's misrepresentations, deceptive practices individually and

with others, fraudulent transactions individually and with others, over charges,

legal malpractice in representing Petitioners, himself and others in direct conflict,

conversion of Petitioners monies unto himself, and withholding of Petitioners'

funds without just cause, maintaining monies belonging to Petitioners for

excessive periods of time in his trust account without cause or proper accounting,

Petitioners have suffered financial damages, mental anguish, financial loss, loss

of property, loss of Money, loss of their home, loss of business, loss of respect in

community among friends and relatives, all in an amount to be determined by the

trier of fact.

## RICO FACTS AND CAUSE OF ACTION

46.     The individual defendant and the Enterprise (GERALD WASSERMAN and

BACH and WASSERMAN, LLC) have engaged in a "pattern of racketeering

activity," as defined in §1961 of RICO, by committing and/or conspiring to

commit or aiding and abetting transactions with at least two such acts of

racketeering activity, as described herein, within the past ten years.  Each

act of racketeering activity was related, had similar purposes, involved the

same or similar participants and methods of commission, and had similar

results impacting similar victims, including Plaintiff(s) herein.

47.     These predicate acts are related in the sense that they have the same

purpose (to carry out the schemes described herein); result (to fraudulently

obtain money from Petitioners); victims (such as Petitioners herein); method of commission (the schemes described herein); and are otherwise interrelated by distinguishing characteristics and are not isolated events, because they were carried out for the same purpose over a period of at least three to four years.

48.    Predicate acts were committed in the same manner, and they constituted the Enterprises' and individual defendant's "normal" way of doing business with regard to the fraudulent and illegal acquisition of Petitioners' money and property.   Further, defendants were and are also engaged in other business activities separate and apart from the scheme detailed herein, and their unlawful actions, which constitute the predicate acts giving rise to this RICO claim, are within their "normal" and "regular" way of doing business.

49.    The related predicates amount to a continued criminal activity because they extended over a substantial period of time.

50.    The Enterprise's and defendants' courses of action entails a span of years, during which Defendants committed numerous, related predicate acts as part of their continuing scheme.    Also, the predicate acts are closely intertwined as far as actors, goals, nature, functioning and structure of the operations described herein in the persecution of Petitioners.

51.    The multiple acts and the continuity and relatedness of racketeering activity committed and/or conspired to or aided and abetted by Defendants, as

described herein, were related to each other, amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5).

52.   RICO protects the legitimate "enterprises" such as Bach and Wasserman from employees, officers, managers, and agents who have committed the unlawful acts described in the "pattern of activity" described below.

53.   RICO protects the public from defendants who would unlawfully use an "enterprise" (legitimate or illegitimate) as a vehicle through which to commit the fraudulent and illegal schemes described herein.

54.   The defendant WASSERMAN and other persons such as the employees, managers, officers and other agents of the enterprise has used the legitimate enterprise to carry out their scheme upon the Petitioners as well as to victimize the corporate persons of corporate defendant and the businesses of Petitioners.

55.   The Association in Fact of the WASSERMAN and the employees, managers, officers and agents of the enterprise (BACH and WASSERMAN), and the corporate defendant have used their Association in Fact to carry out their scheme upon the victims.  Their Association exists separate and apart from the racketeering activity.  The Case Statement will show that each member acted as a part of a unit, and that the whole unit was necessary to carry out the scheme.

56.   The pattern of racketeering activity herein was made through fraudulent misrepresentations and claims through the U. S. Mail and telephone to Petitioners Nathaniel and Kecia Joseph and to the department of Housing and Urban Development and other agencies of the local, state and United States governments.  These communications include fraudulent misrepresentations and fraudulent and illegal claims relating to and including, but not limited to, the following:

   a.   non-existent debts of Petitioners to defendants;

   b.   fraudulent debts and claims against Petitioners funds and properties and business;

   c.   securities and mortgages against Petitioners' property to secure non-existent and fraudulent debts;

   d.   forged forms and allegations to HUD in Petitioner's names without authorization or knowledge of Petitioners, through which defendants profited at the expense of both Petitioners and the United States Government;

57.   The U. S. Mails were used to send correspondence designed to perpetuate and support the scheme.  These communications have been made continuously over more than a two year period by WASSERMAN and the employees, managers, officers and other agents of the enterprise  in their capacity as managers, officers and agents of the enterprise.

58. These communications, the conduct of the schemes and the enterprise have all been continuing over at least a two year period, and function as a unit in the perpetuation of the scheme and accomplishment of its goals.

59. The enterprise: BACH and WASSERMAN, LLC, GERALD WASSERMAN, employees, officers, and agents of the enterprise.

60. All petitioners and victims have been injured directly and indirectly by the fraudulent schemes described herein.

61. All defendants and the enterprise, at various times, participated in the conspiracy by performing tasks designed to further the scheme.

62. All defendants, both in their roles as participants and victims, the Association in Fact and others, used the mails, telephone and other methods of interstate communication in furtherance of the scheme.

63. WASSERMAN, as Petitioners' lawyer and confidant, gave them fraudulent and false advice designed to rob them of money and property, designed to have Petitioners pay to WASSERMAN more than one thousand ($1,000.00) per month on a debt they did not owe, and other fraudulent acts described above and below, through the mails and telephone and other methods of interstate wire and communication.

## COUNT I - RICO

## DEFENDANTS ARE GUILTY OF CIVIL VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

### The Rico Enterprise

64.    Claimants are "person(s)" within the meaning of 18 U.S.C. §1964( c ).

65.    At all times relevant hereto, Claimants and Defendants were "persons" within the meaning of 18 U.S.C. §1961(3).

66.    An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

67.    Defendants did knowingly, unlawfully, and intentionally combine, confederate, conspire and agree together with each other, and with co-conspirators and others whose names are both known and unknown, to benefit and use proceeds from Defendants' pattern of racketeering activity for the furtherance of the legitimate aspects of the organization, such as stockholder dividends, employee and executive salaries, bonuses and operating expenses, to purchase and acquire goods and services, direct the proceeds of the racketeering activity into the general funds of these Defendant organizations, their employees, their executives, their stockholders, their subcontractors and others.  This violation was in concert with corrupt and/or inept employees and agents, other companies, attorneys, constituting an association in fact for the purpose of racketeering activity.

68.   The enterprise at issue in this case, for purposes of 18 U.S.C. §§1961(3) and 1962(a), 1962(b), 1962( c ) and 1962(d), is the law firm of BACH and WASSERMAN.  The acting individual player is GERALD WASSERMAN. Additional wrongdoers that may be part of the association-in-fact enterprise (sometimes referred to herein as "Member" or "Members") include the individual Defendants themselves, those employees and agents of the individual Defendants and other non-defendant entities or co-conspirators that participated in the fraudulent misrepresentations to the Claimants, the public, the courts, and various regulatory and enforcement agencies.

69.   While the defendants participated in the enterprise and were a part of it, the Defendants also have an existence separate and distinct from the Enterprise.

70.   Defendant WASSERMAN and his employees maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

71.   Defendant WASSERMAN'S control and participation in the Enterprise was necessary for the successful operation of Defendants' scheme.

72.   The Enterprise, a law firm, had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

73.   The Enterprise, WASSERMAN, and the employees, the Association in Fact, worked together to orchestrate the schemes at issue and shared profits therefrom.   The association-in-fact enterprise and the Enterprise were

comprised of formal, ongoing relationships which functioned as a continuing unit, pursuing a course of conduct with a common or shared purpose and continuity of structure and personnel (including partners, associates and support staff).  On information and belief, the schemes herein are just an example of those in which the Enterprise, the Association in Fact and all respective members of each participated as a decision-making, functioning unit.

74.  Defendants and those employed by and/or associated with the Enterprise and the Association in Fact, both of which engaged in interstate commerce, have conducted the affairs of the respective enterprises through a pattern of racketeering activity in violation of 18 U.S.C. §§1962(a), (b), and ( c ) and have conspired to violate §1962(a) - ( c ) in violation of 1962(d) by illegally and fraudulently creating bogus legal documents and obligations, forging legal documents, and falsely representing to Petitioners and others similarly situated the nature, meaning and effect of those documents.

75.  All Defendants have violated 18 U.S.C. §1962(d), inasmuch as they knowingly, intentionally, and unlawfully, in aiding and abetting each other, conspired to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through the pattern of racketeering activity described herein.

### Defendants' Scheme

76.  For a period of time known and unknown, defendants herein fraudulently stole

money and property from petitioners through the use of fraudulent and illegal practices through the operation of the law firm of BACH and WASSERMAN (the enterprise).  The scheme was carried out through the mails and in this district.

## NON-RICO CAUSES OF ACTION

## COUNT II - THE CONSPIRACY

77.   At all times pertinent, the defendants conspired, confederated, and agreed among themselves to deprive claimants of their property and money.  As such, the individual actions of the defendants are imputable to one another as a matter of law.

## THE BACKGROUND

78.   The allegations of fact comprise the background facts, allegations and overt acts which constitute the following violations of law.  The acts and omissions of defendants have caused petitioners damages in the form of loss of property, loss of money, humiliation and embarrassment after Petitioners were robbed of nearly everything they owned by defendant WASSERMAN through the use of BACH AND WASSERMAN, loss of reputation, severe mental and emotional distress, anxiety, and domestic turmoil.

## COUNT III

79.   Claimants re-allege and reiterate all previous and subsequent allegations.

80.   Defendants' actions violated claimants' rights under the Louisiana

Racketeering Act.  (La. R.S. 15:1351 *et seq*.) by conspiring to and by depriving them of their property and money, their business and home, through the violations of the predicate acts and omissions as alleged herein.   And by the acts and omissions above.

81.    Defendants' actions caused Claimants great damage in terms of loss of property, money, profits, loss of reputation, loss of income, and mental and emotional pain and suffering for which defendants should be made to answer in damages.

## COUNT IV

82.    Claimants re-allege and reiterate all previous and subsequent allegations.

83.    Defendants' actions violated claimants' rights under  Louisiana Unfair Trade Practices and Consumer Protection Act.  (La. R.S. 51:1401 *et seq*.)by conspiring to and by  depriving  them of their property, money, home and businesses through violations of the predicate acts and omissions as alleged herein.  And by the acts and omissions described above.

84.    Defendants' actions caused Claimants great damage in terms of loss of profits, loss of reputation, loss of income, loss of property, and mental and emotional pain and suffering for which defendants should be made to answer in damages.

## COUNT V

85.    Claimants re-allege and reiterate all previous and subsequent allegations.

86.    Defendants' actions violated claimants' rights under  Articles 2315 and 2324 of the Louisiana Civil Code by conspiring to illegally deprive them of and by illegally depriving them of their property, money, businesses, homes and other items of value through violations of the  acts and omissions as alleged herein.

87.    Defendants' actions caused Claimants great damage in terms of loss of profits, loss of reputation, loss of income, loss of property, and mental and emotional pain and suffering for which defendants should be made to answer in damages.

88.    Further, under this Count, defendants intentionally caused claimants great and severe emotional harm, intended to cause said harm, and did so by the execution of acts and omissions that have no place in a civilized society.

## <u>COUNT V</u>I

## NEGLIGENT AND INTENTIONAL MISREPRESENTATION

89.    Claimants re-allege and reiterate all previous and subsequent allegations.

90.    Defendants' actions violated claimants' rights under  Articles 2315 and 2324 of the Louisiana Civil Code through negligent and intentional misrepresentation.

91.    The defendants, GERALD WASSERMAN and BACH and WASSERMAN, owed Petitioners duties of care, loyalty and honesty, and a duty to comply with the applicable standards of care and the laws of the State of Louisiana and the United States, and any and all regulations governing the exercise of their

duties.

92.   During the course of their dealings with Petitioners, defendants made numerous knowingly and negligently false affirmative representations, and intentional or negligently misleading omissions of fact as set forth above.

After discovering the defendants' misrepresentations, and fraudulent acts, Petitioners incurred and will continue to incur substantial additional costs in the prosecution of this case, and in the loss of other financial opportunities.

93.   As a proximate cause of the foregoing, Petitioners have been injured in an actual amount to be proven at trial, and should be awarded damages in accordance with the evidence, plus attorneys' fees and costs.

94.   Defendants' actions caused Petitioners great damage in terms of loss of profits, loss of reputation, loss of income, loss of property, and mental and emotional pain and suffering for which defendants should be made to answer in damages.

95.   Further, under this Count, defendants intentionally caused Petitioners great and severe emotional harm, intended to cause said harm, and did so by the execution of acts and omissions that have no place in a civilized society.

Defendants caused Petitioners the following non-exclusive damages:

A.   **Jean Lafitte Property:**

(1)   defendant illegally held escrow in an amount in excess of one hundred four thousand ($104,000.00) dollars from the two HUD

Statements dated February 26 and 27, 2003, which has yet to be returned to Petitioners;

(2)     due to the same HUD statements defendants owe Petitioners in excess of twelve thousand ($12,000.00) dollars plus interest and payments illegally and fraudulently received by the defendant for non-existent insurance of the Jean Lafitte Property;

(3)     in addition to the illegally collected money for insurance never obtained but deducted from the HUD Statements in February of 2003, defendants owe Petitioners in excess of seventy thousand ($70,00.00) dollars for other illegal deductions on the fraudulent HUD Statements created by defendants on the Lafitte Property;

(4)     defendant Wasserman further owes Petitioners for the illegal and fraudulent resale of the Jean Lafitte Property, sold to one "Steve" in excess of two hundred twenty thousand ($220,000.00) dollars. Petitioner never authorized defendant Wasserman's sale of the Lafitte Property as defined by the terms of the lease agreement. The Lafitte Property was to be used only as collateral.

B.      **Glasgow 26 Unit Apartment Complex:**

(1)     defendants owe Petitioners in excess of two hundred twenty-five thousand ($225,000.00) dollars plus interest and payments illegally collected by defendants from the HUD Statements of May

of 2003 and July of 2003;

(2)    Wasserman claimed, in a letter sent through the U. S. Mails to Mr. Harvey and Mr. Ramsey, the he, Wasserman, returned to Petitioners payments made to defendant Wasserman on the Glasgow property in excess of seventeen thousand ($17,000.00) dollars.  Petitioners never received these sums and said letter was false and fraudulent;

(3)    defendant Wasserman owes to Petitioners a sum in excess of one hundred thousand ($100,000.00) collected from one Mr. Ramsey that belonged to Petitioners but was never delivered by Wasserman;

(4)    defendant Wasserman fraudulently and without authorization sold the Glasgow apartments, which appraised for an amount in excess of five hundred thousand ($500,000.00) dollars, for which defendant is indebted to Petitioners;

**C.    52 Foot Mobile Restaurant Unit:**

(1)    defendant Wasserman fraudulently represented to Petitioners that Petitioners owed defendant Wasserman in excess of three hundred thousand ($300,000.00) dollars in connection with the attempted purchase of a 52 Foot Mobile Restaurant Unit.  This debt was non-existent and Petitioners lost the Unit.  Wasserman

owed Petitioners the amount of the illegal debt and a new Unit;

(2)     Due to defendant's unlawful schemes, fraud and theft form Petitioners they were unable to repay a loan pledged against to secure a CD in 2002 at an interest rate of 7%/annum, totaling a loss of one million ($1,000,000.00) dollars.

(3)     Due to Petitioner's unlawful and fraudulent schemes, Petitioners lost their time share purchased in 2002 with Wind Star.

WHEREFORE, Petitioners NATHANIEL JOSEPH AND KECIA JOSEPH AND LUCINDA MITCHELL   pray that this petition be filed and served, and that the Defendants, GERALD D. WASSERMAN and BACH and WASSERMAN, be served with a copy of this petition, that they be duly cited to appear and answer same and after all proceedings there be a favor of Your Petitioners, for all amounts commensurate with their damages, all as reasonable under the premise, to be determined by the trier of fact for compensatory, punitive, nominal, exemplary, actual, equitable, legal and all other damages which the Court deems necessary and proper resulting from the

(1)     misrepresentations,

(2)     deceptive practices,

(3)     fraudulent transactions,

(4)     over charges,

(5)     intentional conversion of Petitioners' funds,

(6)     acts in collusion with others to deprive Petitioners of their rights to property and to manipulate financial documents, HUD statements to reflect monies Petitioners had

received which they did not receive,

(7)     all described RICO and other statutory violations and all other unjust and unethical

activities to be determined prior to and at trial;

of defendants, together with legal interest, thereon from the date of judicial demand until

paid, for all cost of these proceedings, for all expert fees, for all attorney fees and for all

general and equitable relief.

> Respectfully Submitted:
>
> _s/_John-Michael Lawrence_____
> John-Michael Lawrence (8143)
> John-Michael Lawrence, LLC
> Energy Center - Suite 2900 - PMB 204
> 1100 Poydras Street
> New Orleans, La. 70163-2900
> (504) 585-7797 tel
> (225) 744-8748 fax
> E-MAIL - JMLaw122@cox.net